# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 23-2025V

|                                         |                                  |
|-----------------------------------------|----------------------------------|
| LYNNE CONGDON,                          | Chief Special Master Corcoran    |
|      Petitioner, | Filed: August 21, 2025         |
| v.                                      |                                  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |                                  |
|      Respondent. |                                |

*Jessica Anne Olins, Mctlaw, Seattle, WA,* for Petitioner.

*Adam Nemeth Muffett, U.S. Department of Justice, Washington, DC,* for Respondent.

### DECISION AWARDING DAMAGES[1]

On November 22, 2023, Lynne Congdon filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered Guillain-Barré syndrome ("GBS"), a defined Table injury, after receiving influenza, tetanus, diphtheria, and acellular pertussis, and meningococcal vaccines on February 28, 2022. Petition at 1 ¶¶ 24-25. Although Respondent conceded entitlement, the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] Approximately three months after I determined Petitioner entitled to compensation, she informed me that the parties had reached an impasse in their damages discussions and requested that I set a briefing schedule. Status Report, filed Dec. 11, 2024, ECF No. 27.

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$141,651.88**, **representing $137,000.00 for actual pain and suffering, plus** $4,651.88 for past unreimbursable expenses.

**I.	Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 590. Instead, *Graves* assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II. Prior SPU Compensation of GBS Pain and Suffering[4]

### A. Data Regarding Compensation in SPU Flu/ GBS Cases

Flu/GBS cases have an extensive history of informal resolution within the SPU. As of July 1, 2025, since SPU's inception ten years ago, 944 GBS cases have been resolved. Compensation has been awarded in the vast majority of cases (897), with the remaining 47 cases dismissed.

The data for all categories of theses damages decisions reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[5] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *62* | *441* | *22* | *372* |
| **Lowest** | $96,008.66 | $9,050.40 | $20,000.00 | $3,098.64 |
| **1st Quartile** | $152,831.02 | $125,000.00 | $135,575.00 | $100,000.00 |
| **Median** | **$170,279.32** | **$163,519.91** | **$224,397.27** | **$150,000.00** |

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[5] One award was for an annuity only, the exact amount which was not determined at the time of judgment.

| | | | | |
|---|---|---|---|---|
| **3rd Quartile** | $187,372.52 | $242,280.55 | $358,778.33 | $220,000.00 |
| **Largest** | $244,390.18 | $2,282,465.84 | $985,000.00 | $1,200,000.00 |

### B.  Adjudication Specifically of GBS Pain and Suffering

Only a small minority of cases have involved a special master's adjudication of damages issues. The written decisions setting forth such determinations provide the most reliable guidance in deciding what similarly-situated claimants should also receive.[6]

As of July 1, 2025, in nearly every occasion that SPU has had to resolve the appropriate award for GBS pain and suffering, over $100,000.00 has been awarded (with a lower sum, $92,500.00, only awarded once). The remaining sixty-one (61) awards far exceeded $100,000.00. The first-quartile value is $150,000.00. The median is $165,000.00. The third-quartile value is $174,375.00. The largest award was $197,500.00.

These decisions are informed by what is known about GBS, including its description as set forth in the Vaccine Injury Table ("Table"). Pursuant to the Table, vaccine causation is presumed for GBS with an onset 3 - 42 days (not less than 3 days, and not more than 42 days) after receipt of a seasonal flu vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). The Qualifications and Aids to Interpretation ("QAI") explain:

> GBS is an acute monophasic peripheral neuropathy that encompasses a spectrum of four clinicopathological subtypes… The interval between the first appearance of symptoms and the nadir of weakness is between 12 hours and 28 days. This is followed in all subtypes by a clinical plateau with stabilization at the nadir of symptoms, or subsequent improvement without significant relapse. Death may occur without a clinical plateau. Treatment-related fluctuations in all subtypes of GBS can occur within 9 weeks of GBS symptom onset, and recurrence of symptoms after this timeframe would not be consistent with GBS.

42 C.F.R. § 100.3(c)(15)(I) (2017). The three most common subtypes are acute inflammatory demyelinating polyneuropathy ("AIDP"); acute motor axonal neuropathy

---

[6] Of course, even though *all* independently-settled damages issues (whether by stipulation/settlement or proffer) must still be approved by a special master, such determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

("AMAN"); and acute motor and sensory neuropathy ("AMSAN"). *Id.* The onset of each is marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." *Id.* at (c)(15)(II). The fourth subtype – Fisher syndrome or Miller-Fisher syndrome – has a different onset of "bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; [and] ataxia." *Id.* at (c)(15)(III).[7]

A consistent starting consideration is that "GBS pain and suffering awards generally should be higher than those awarded to petitioners who have suffered a less frightening and physically alarming injury, such as SIRVA."[8] *Gross v. Sec'y of Health & Hum. Servs.*, No. 19-0835V, 2021 WL 2666685, at *5 (Fed. Cl. Spec. Mstr. March 11, 2021); *see also, e.g.*, *Castellanos v. Sec'y of Health & Hum. Servs.*, No. 19-1710V, 2022 WL 1482497, at *10 (Fed. Cl. Spec. Mstr. Mar. 30, 2022) (emphasizing recognition of "the seriousness of GBS as a general matter," in awarding a six-figure sum); *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830, at *10 (Fed. Cl. Spec. Mstr. July 6, 2023) (noting GBS's "frightening" nature).

But of course, not every GBS case is equally severe. Further details of the initial medical course are considered – including any mistake or delay in diagnosing GBS; any in-patient hospitalization and/or in-patient rehabilitation (and the duration of any such stays); diagnostic procedures (e.g., bloodwork, lumbar punctures, electrodiagnostic studies, imaging); the severity of symptoms at their nadir (e.g., involving incontinence or respiratory failure); the extent and effectiveness of treatment (e.g., IVIg, plasmapheresis, pain medications); other interventions (e.g., feeding tubes, breathing tubes, catheterization); and any complications (e.g., sepsis during hospitalization).

Also relevant is a petitioner's long-term course – as evidenced by out-patient therapies, neurology evaluations, and other medical appointments concerning GBS; the results of repeat electrodiagnostic studies and other relevant tests; medical providers' assessments of the degree of recovery achieved; ongoing reliance on assistive devices and medications; and relevant treatment gaps. Previous opinions have recognized that "a substantial recovery does not mean that [an individual] has fully recovered from his GBS and has no ongoing sequelae. It is common for petitioners to experience ongoing symptoms of GBS, such as numbness and fatigue, even with a good recovery." *Elenteny*

---

[7] *See also National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table – Notice of Proposed Rulemaking*, 80 Fed. Reg. 45132, at 45144 – 45 (July 29, 2015) (proposing addition of Table flu/GBS claims – explaining GBS is "an acute paralysis caused by dysfunction in the peripheral nervous system [that…] may manifest with weakness, abnormal sensations, and/or abnormality in the autonomic (involuntary) nervous system," and that death, when it occurs, is most often related to respiratory failure).

[8] Shoulder injury related to vaccine administration ("SIRVA") is another Table injury. 42 C.F.R. §§ 100.3(a), (c)(10).

*v. Sec'y of Health & Hum. Servs.*, No. 19-1972V, 2023 WL 2447498, at *5 (Fed. Cl. Spec. Mstr. Mar. 10, 2023). But symptoms of that nature are typically folded into a "typical" past pain and suffering award, and will not justify a future component. *See, e.g.*, *id.*; *Miller v. Sec'y of Health & Hum. Servs.*, No. 21-1559V, 2023 WL 2474322, at *8 (Fed. Cl. Spec. Mstr. Feb. 10, 2023).

In addition, "[t]he mere fact that a claimant had pre-vaccination comorbidities does not *per se* diminish the impact of [the vaccine injury] on his life – especially one as alarming and potentially life-altering as GBS – and therefore is not alone reason for a lower award." *Bircheat v. Sec'y of Health & Hum. Servs.*, No. 19-1088V, 2021 WL 3026880, at *4 (Fed. Cl. Spec. Mstr. June 16, 2021). But a special master is statutorily required to consider to what extent a petitioner's pain and suffering is truly "*from* the vaccine-related injury," Section 15(a)(4) (emphasis added), and not from any unrelated preexisting or subsequently-developed medical issues. *See, e.g.*, *Bircheat*, 2021 WL 3026880, at *4; *Gross*, 2021 WL 2666685, at *5.

Also worthy of consideration are the injury's impact on a petitioner's personal circumstances including his or her family and other personal obligations, and professional life (whether or not lost wages are directly claimed).

All of these facts are primarily gleaned from the medical records – although sworn statements and/or other evidence often *supplements* the facts reflected in the medical records.

### III.    The Parties' Arguments

The parties agree Petitioner should be awarded $4,651.88 for past unreimbursed expenses. Petitioner's Memorandum in Support of Findings of Fact and Conclusions of Law Regarding Damages ("Brief") at 2, ECF No. 29; Respondent's Brief on Damages ("Opp.") at 1, 1 n.1, ECF No. 28. Thus, the only area of disagreement is the amount of compensation which should be awarded for actual pain and suffering. Petitioner seeks $190,000.00, and Respondent argues for an award of $92,500.00. Brief at 15; Opp. at 1, 9.

Characterizing her ongoing symptoms as "life-altering consequences," Petitioner argues that she "has experienced significant emotion trauma, a loss of independence, and a dramatic decline in her overall wellbeing." Brief at 14. Insisting that she continues to suffer the effects of her GBS illness more than three years post-vaccination, Petitioner describes difficulties eating, drinking, speaking while conducting tours at work, and whistling while training dogs (*id.* at 13-24); and reports eyes issues: "constant watering, blurred vision, crusting, and discharge" that require daily eye drops and lid scrubs (*id.* at

6

14).

Petitioner favorably compares the duration of her hospital stay and medical treatment - consisting of an EMG, one course of IVIG therapy, three months of speech therapy, and two lumbar punctures (the first of which was unsuccessful) - with those experienced by the petitioners in *Voeller, Hernandez,* and *Drcar,*[9] all featuring past pain and suffering awards ranging from $185,000.00 to $200,000.00. Brief at 12-13. She insists that her "case is analogous to that of *Drcar*," emphasizing the *Drcar* petitioner's difficulty obtaining a correct diagnosis, five years of treatment, and inability to return to work. *Id.* at 13.

To support a lower award, Respondent emphasizes evidence of prior testing that showed chronic denervation in Petitioner's feet,[10] and a shorter duration than Petitioner claims. Opp. at 2 n.2, 6. counters that $92,500.00 is an appropriate amount for Petitioner's past pain and suffering. Opp. at 1, 9. Although he provides a similar medical history to the one Petitioner recounts (*id.* at 2-5), Acknowledging that Petitioner "continued to have issues with intermittent tearing" and to complain of numbness in her face and feet (*id.* at 6), Respondent portrays her illness as primarily resolved within ten months (*id.* at 4, 9).

As comparable cases, Respondent cites two cases he describes as involving pain and suffering awards of $92,500.00 - *Granville* and *Geschwindner*.[11] Opp. at 6-9. However, closer examination of the *Geschwindner* case reveals that the compensation paid for pain and suffering was likely greater.[12]

---

[9] *Voeller v. Sec'y of Health & Hum. Servs.*, No. 20-1526V, 2023 WL 5019830 (Fed. Cl. Spec. Mstr. July 6, 2023) (awarding $185,000.000 for past pain and suffering); *Hernandez v. Sec'y of Health & Hum. Servs.,* No. 21-1572V, 2023 WL 3317354 (Fed. Cl. Spec. Mstr. May 9, 2023) (awarding $192,000.00 for past pain and suffering); *Drcar v. Sec'y of Health & Hum. Servs.,* No. 21-1766V, 2024 WL 5266648 (Fed. Cl. Spec. Mstr. Nov. 14, 2024) (awarding $200,000.00 for past pain and suffering). Although Petitioner cites the *Voeller* as "*N.V.*", "*Voeller*" is the correct title.

[10] Respondent mentions an EMG study performed almost a year prior to vaccination, for tingling in the pads of [Petitioner's] big toes of both feet and laterally in the left foot," that revealed chronic denervation. Opp. at 2 n.2 (citing Ex. 2 at 26).

[11] *Granville v. Sec'y of Health & Hum. Servs.,* No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023). Although Petitioner provides a westlaw cite of 2022 WL 177372 for *Geschwindner*, that January 28, 2022 decision was withdrawn in response to the granting of Petitioner's request for post-judgment relief. *See Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2022 WL 22942770 (Fed. Cl. Spec. Mstr. Oct. 11, 2022).

[12] In a subsequent decision in *Geschwindner,* the special master awarded an additional $27,500.00 based upon Respondent's proffer, but the decision does not clearly state whether that amount was for pain and suffering or attributable to some other category of compensation. *See Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2024 WL 938952 (Fed. Cl. Spec. Mstr. Feb. 5, 2024).

In their responsive briefs, the parties reiterate their earlier arguments and attempt to distinguish Petitioner's facts and circumstances from the petitioners in the comparable cases cited by Respondent. ECF Nos. 31-32. In particular, Petitioner includes a discussion of the more complicated procedure in *Geschwindner*. Petitioner's Responsive Brief at 5-6.

### IV.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties in written documents. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The evidence shows that Petitioner (age 60 when vaccinated) suffered a mild GBS illness resulting in facial drooping and numbness and tingling in her upper and lower extremities (primarily her feet). Despite a slight delay – due to a misdiagnosis at an earlier visit to her primary care provider ("PCP"), and difficulties encountered when attempting a lumbar puncture on the first day of her hospitalization[13] - Petitioner obtained a quick diagnosis within seven days of symptom onset.[14] During her six-day hospitalization her symptoms worsened slightly but then improved in response to a five-day course of IVIG.[15]

---

[13] On March 16, 2022, Petitioner visited her primary care provider ("PCP"), complaining of numbness in her feet during the past two days. Ex. 2 at 5. Noting Petitioner's chronic back pain, the PCP prescribed oral steroids. *Id.* Four days later, on March 20, 2022, Petitioner was hospitalized. A lumbar puncture was twice attempted but unsuccessful due to Petitioner's prior lumbar fusion Ex. 3 at 27, 106.

[14] A successful lumbar puncture performed on March 21, 2022, the second day of Petitioner's hospitalization. Ex. 3 at 148. Petitioner was diagnosed with GBS, and IVIG therapy was started. *Id.*

[15] During an evaluation on March 21, 2022, Petitioner reported numbness and tingling in her arms and legs, but good strength. Ex. 3 at 97. She ambulated and performed transfers, for example from chair to bed, without assistance - requiring verbal cues to slow down, and catching herself once when off balance. *Id.* During an evaluation the next day, Petitioner reported "facial numbness and difficulty with lingual and labial rom." *Id.* at 102. Although unable to use a straw, take water from a bottle, or eat pureed or soft food from a spoon, Petitioner "was able to take sips from [a] stryofoam cup" without coughing of showing signs of aspiration. *Id.*

After Petitioner reported a worsening of symptoms, on March 23, 2022, it was determined that one IVIG dose had not been administered the previous day. Ex. 3 at 45-46, 49. Describing difficulties speaking, swallowing, and keeping her eyes closed, Petitioner reported increased bilateral numbness and facial weakness. *Id.* at 45, 47, 49-50. However, her speech was assessed as being "fluent without errors" (*id.* at

Following her discharge on March 26, 2022,[16] Petitioner's symptoms continued to slowly improve. *See* Ex. 2 at 4, 78-80 (PCP and neurology visits in April 2022).[17] She attended nine speech therapy sessions from early May through mid-August 2022. Ex. 13 at 7, 30-62. Requesting discharge from speech therapy on August 16, 2022, she reported that she had returned to work two days a week, with an expected increase to four and had improved the quality of her speech and lip function. *Id.* at 62. However, Petitioner continued to require accommodations from her co-workers, was unable to drink from a straw, and was forced to use an electronic whistle when training dogs. *Id.*

By late October 2022, Petitioner was able to use a straw, and reported a decrease in eye symptoms and need for drops. Ex. 14 at 69. In late January 2023, ten months after her symptom began, Petitioner "stated that 'she was able to participate in a dog training on 1/22/2023 for 2 hours outside in the woods.'" *Id.* at 70. During the remainder of 2023, she experienced only mild and intermittent symptoms, such as tearing when looking down and occasionally facial numbness and weakness. *Id.* at 71; Ex. 19 at 33-37; Ex. 28 at 7-8; Ex. 25 at 17 (in chronologic order).

The comparable cases cited by Petitioner clearly involved more serious GBS illnesses. All petitioners in those cases suffered severe initial symptoms - including an inability to walk unassisted, for significant time periods while struggling to obtain an accurate diagnosis. *Voeller*, 2023 WL 5019830, at *2; *Hernandez*, 2023 WL 3317354, at *2; *Drcar*, 2024 WL 5266648, at *2-3. The *Voeller* and *Hernandez* petitioners required inpatient rehabilitation of 18 and 16 days, respectively, and the *Hernandez* and *Drcar* endured extensive sequela for more than three years. *Voeller*, 2023 WL 5019830, at *2; *Hernandez*, 2023 WL 3317354, at *2, 5 (describing years of physical therapy); *Drcar*, 2024 WL 5266648, at *5, 13.

---

47), and she reported good strength, improved lip movement, and an ability to drink two days later, on March 25, 2022. *Id.* at 74, 78. At that time, Petitioner was described as experiencing primarily facial weakness "with prominent sensory symptoms" (*id.* at 78), having one more day of IVIG, and requiring continued use of artificial tears for lubrication (*id.* at 88).

[16] Assessed as having made slow progress, with real weakness only in her face, Petitioner was discharged on March 26, 2022, with a warning that her recovery will take time and instructions to follow-up with neurology and speech therapy. *Id.* at 148-150.

[17] At the neurology visit on April 5, 2022, Petitioner reported increased sensation in the bottom of her right foot, a lack of numbness in her face and some movement in her right cheek, greater ability making sounds, and "[n]o trouble chewing or swallowing," and only some tearing, extremity numbness, and difficulties using a straw, keeping food and liquids in her mouth, and whistling. Ex. 2 at 78. On April 22, 2022, her PCP completed a disability and leave statement, estimating Petitioner could return to work mid-July 2022. *Id.* at 39.

However, the *Geschwindner* case cited by Respondent is similarly unhelpful. The procedural history in that case makes it difficult to ascertain the exact amount of and basis for the award. *See supra* note 12.

Although the *Granville* case is instructive, involving comparable symptom severity, length of hospitalization, and lack of inpatient rehabilitation thereafter; the overall duration of the *Granville* petitioner's illness was much shorter. *Granville,* 2023 WL 6441388, at *4. Her PCP evidenced a willingness to prescribed Lyrica or Gabapentin for tingling in her hands and feet approximately seven months post-vaccination, but there is no evidence that the *Granville* petitioner ever filled the prescription. And she acknowledged in her briefing that her GBS had completely resolved. *Id.* at *3. Thus, the $92,500.00 awarded in *Granville* is clearly too low for this case.

Instead, I find *Lemon*[18] in which $145,000.00 was awarded for pain and suffering, to be a useful comparable case. Like Ms. Congdon, the *Lemon* petitioner endured mild difficulties related to an attempted lumbar puncture, but nevertheless received a quick diagnosis and hospitalization. *Lemon,* 2024 WL 3160695, at *2. She also experienced facial drooping and mild residual symptoms for several years. *Id.* at *2, 4. However, the *Lemon* petitioner suffered more extensive numbness (up to her diaphragm) and exhibited more difficulty with movement. Although she also did not require inpatient rehabilitation, the *Lemon* petitioner required additional therapies after hospitalization, that were not required here, specifically occupational and physical therapy. *Id.* at *2-4.And there is evidence suggesting that at least some of Petitioner's foot tingling and numbness may be due to an unrelated prior condition. *See* Ex. 2 at 26 (results of EMG performed on April 16, 2021). Thus, I find that Petitioner's pain and suffering award should be similar to, but slightly lower than, the amount awarded in *Lemon.*

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $137,000.00 represents a fair and appropriate amount of compensation for Petitioner's past/actual pain and suffering.**[19]

---

[18] *Lemon v. Sec'y of Health & Hum. Servs.*, No. 22-0701V, 2024 WL 3160695 (Fed. Cl. Spec. Mstr. May 23, 2024).

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

**I therefore award Petitioner a lump sum payment of $<u>141,651.88</u> representing compensation in the amounts of $137,000.00 for pain and suffering and $4,651.88 for actual unreimbursable expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[20]

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master

---

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.